IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-00828-MEH

KRISTEN J. BRADLEY,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

# ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

     Plaintiff Kristen Bradley appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), originally filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c.  Jurisdiction is proper under 42 U.S.C. § 405(g).  The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal.  After consideration of the parties' briefs and the administrative record, the Court **reverses** the ALJ's decision and **remands** the matter to the Commissioner for further consideration.

# BACKGROUND

## I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying her applications for

DIB and SSI benefits filed on December 28, 2011.  [Administrative Record ("AR") 265-272]  After

the applications were initially denied on April 27, 2012 [AR 151-156], an Administrative Law Judge

("ALJ") scheduled a hearing upon the Plaintiff's request for May 8, 2013 [AR 166-178], at which

the ALJ ordered postponement of the hearing to allow Plaintiff time to seek legal counsel and

supplement the record [AR 103-112].  The next hearing was held on December 10, 2013, at which

Plaintiff was represented by counsel, and the Plaintiff and a vocational expert testified.  [AR 63-101]

The ALJ issued a written ruling on January 13, 2014 finding Plaintiff was not disabled starting on

December 14, 2011 because considering Plaintiff's age, experience, and residual functional capacity,

she could perform jobs existing in significant numbers in the national economy.  [AR 130-146] After

Plaintiff appealed the decision, the SSA Appeals Council remanded the matter to the ALJ saying ".

. . the established residual functional capacity does not adequately identify or articulate functional

limitations consistent with the above-referenced severe impairment of bilateral carpal tunnel

syndrome." [AR 148]  Accordingly, the Appeals Council ordered the ALJ on remand to

> •   Obtain additional evidence concerning the claimant's impairment in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.912-913).   The additional evidence may include, if warranted and available, consultative examinations and medical source statements about what the claimant can still do despite the impairment.

> •   Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to

evidence of record in support of assessed limitations (Social Security Ruling 96-8p).

•    If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

[AR 148-149] On remand, the ALJ held another hearing on April 8, 2015 at which the Plaintiff and a vocational expert, Ms. Dunn, testified. [AR 31-55] Once again, the ALJ issued an unfavorable decision [AR 13-30], and Plaintiff appealed the decision.  On February 18, 2016, the SSA Appeals Council denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review [AR 1-6].  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.    Plaintiff's Alleged Conditions

Plaintiff was born on May 16, 1967; she was 44 years old when she filed her applications for DIB and SSI on December 28, 2011.  [AR 304]  Plaintiff claims she became disabled on December 14, 2011 [*id.*] and reported that she was limited in her ability to work due to back problems, neck problems, sciatic pain in both legs, numbness in both hands, bilateral elbow pain, chronic headaches, and restriction of movement in her right hand.  [AR 308]  Plaintiff filed a

"Function Report" in tandem with her application, in which she explained that she was limited in her ability to work because she could "not bend over without se[vere] back pain[;] standing for any length of time causes legs to start aching[,] feet tingling and hands to go numb[, and] neck to ache and headaches." [AR 314] She also stated she could "walk 200 ft. w/out stopping but then [she had] to wait a few min[utes] before [she came] back." [AR 319]

The record indicates that on May 1, 2008, Plaintiff presented to Mercy Regional Medical Center ("Mercy") complaining of "chronic hip and back pain"; Plaintiff reported that she "fell approx[imately] 10 y[ea]rs ago." [AR 467] She also reported "increasing [symptoms] over past 2 mo[nth]s[;] nothing seems to relieve pain." [*Id.*] An x-ray of Plaintiff's lumbar spine revealed "[m]ild degenerative changes including disc disease L4-L5 and L5-S1" [AR 371], and an x-ray of Plaintiff's left hip was "normal" [AR 483].  Two years later, on July 15, 2010, Plaintiff presented to Mercy Health Services Clinic "to establish care" and for "ongoing chronic low back pain." [AR 469] The provider diagnosed Plaintiff with "chronic lumbar radiculopathy" and prescribed Neurontin for pain. [AR 470] Plaintiff returned to the clinic on January 11, 2012, complaining of back pain and a "multitude of body pains." [AR 471] Plaintiff reported she "really does believe that pot helps her manage her pain" and that she "smokes 3 joints/day." [*Id.*] The provider diagnosed degenerative lumbar and cervical disc disease with right hand arthritis and joint pain, and with Plaintiff's consent, the provider prescribed Tramadol for her pain. [AR 472, 475]

On March 17, 2012, Plaintiff presented for a consultative examination with Kimberly Jackson, D.O. [AR 372-376] Plaintiff reported that she could perform daily activities of bathing, dressing, driving, cooking, and cleaning, and she denied any "illicit drug use." [AR 372-373]  After

4

a thorough physical examination, Dr. Jackson diagnosed Plaintiff with bilateral sciatica, left shoulder rotator cuff pain, cervicalgia, and tension headaches, and found Plaintiff could stand and walk for a total of 4 hours, and could sit for a total of 2 hours, in an 8-hour work day; could occasionally bend, stoop, squat, and twist, and could frequently lift and carry approximately 30 pounds; and could occasionally negotiate ladders and stairs. [AR 376]

On January 10, 2013, Plaintiff presented to Southwest Colorado Spine and Musculoskeletal Center for pain in her back, legs, shoulders, and neck. [AR 412] Plaintiff reported that her pain was constant, stabbing, and burning and she was taking no medication. [AR 413-414] She also stated that she used "pot," was "unemployed," and was "applying for disability." [AR 415] After a physical examination, David R. Silva, D.O. determined a "probable left L5-S1 disc protrusion with left L5 radicular symptoms" and ordered an MRI. [AR 402-403] The MRI, performed January 17, 2013, revealed "moderate degenerative disc [disease] at the L5-S1 level with a large eccentric protrusion posteriorly right greater than left which narrows both foramen at the L5-S1 level but also captures the traversing right and left S1 nerve roots." [AR 381, 393] On February 7, 2013, Dr. Silva recommended that Plaintiff undergo a "nerve root block to be followed by physical therapy" and "if her symptoms continue we may need to pursue surgical options." [AR 394] Thus, on February 13, 2013, Plaintiff was admitted to the Animas Surgical Hospital for a "bilateral L5-S1 selective nerve root block." [AR 386]

On April 12, 2013, Plaintiff returned to Mercy reporting to Nurse Practitioner Rosemary Fleming that the nerve block procedure completely relieved her pain, but once the anesthetic wore off, the pain returned and felt worse; she also reported that the physical therapy clinic would not take

her insurance. [AR 492-493] After conferring with Dr. Silva, NP Fleming prescribed Hydrocodone for pain and referred Plaintiff to a different physical therapy clinic that would accept her insurance. [AR 494] Although Plaintiff  denied use of "recreational drugs," her "tox screen" showed positive for cocaine and THC. [AR 389, 494]

An MRI of Plaintiff's cervical spine on July 1, 2013 revealed a "C5-C6 left paracentral disc protrusion with neural compression." [AR 398, 425] Plaintiff presented to Robert S. Davis, M.D. at Southwest on July 9, 2013 for an examination following her complaints of neck and upper extremity pain, numbness, and tingling.  After a physical examination, Dr. Davis found Plaintiff had cervical stenosis, radiculitis, myelopathy, and pain, and ordered further x-rays and an EMG Nerve conduction study. [AR 425-426, 428] Dr. Davis reviewed the results of these tests with Plaintiff on July 24, 2013 at which time he recommended conservative treatment for Plaintiff's carpel tunnel syndrome, and surgery for her cervical stenosis; Plaintiff agreed. [AR 434-435] The surgery was performed on August 12, 2013 and the Plaintiff stated she was "pleased" with the results on August 22, 2013 when she met with Dr. Davis. [AR 466]

Plaintiff saw Dr. Davis next on February 27, 2014 complaining of "returning pain, headaches, and bilateral upper extremity pain." [AR 510] An x-ray of Plaintiff's cervical spine revealed nothing unusual, so the doctor ordered an MRI and another EMG nerve conduction study. [AR 508-509] Dr. Davis discussed the test results with Plaintiff on March 26, 2014, saying the MRI showed only post-operative degenerative changes but the study revealed bilateral carpal tunnel syndrome and a left ulnar/cubital tunnel syndrome; Dr. Davis suggested both conservative treatment and surgery for the syndromes, and Plaintiff said she would return if and when she wished to

6

proceed with surgery. [AR 506]

On May 5, 2014, at the Plaintiff's counsel's request, a physician with "12 years experience evaluating Social Security claimants" reviewed Plaintiff's medical records and concluded there were "five possible ways to find in favor for the claimant" and that Plaintiff "clearly is disabled and the primary question really is onset." [AR 514-517]

Plaintiff presented to NP Fleming on August 1, 2014, seeking completion of "Med-9 disability form," complaining of back pain, and requesting a referral to "Spine CO." [AR 555-556] NP Fleming noted, "I don't think she is permanently disabled," "[s]he is ... independent in ADL's [activities of daily living]," and "[s]he says she has seen a disability physician who has told her she is disabled." [AR 556]

All subsequent medical records concern treatment for shoulder pain, plantar fascial fibromatosis, H pylori infection, and hepatitis C, none of which are at issue in this case.

## III.   Hearing Testimony

At a hearing on May 8, 2013, Plaintiff appeared pro se. [AR 103-112] The ALJ discussed with the Plaintiff the scope of the records produced and the benefits of having a representative at the hearing. [*Id.*] The Plaintiff requested a continuance to allow her to retain counsel and supplement the record, if necessary. [*Id.*] The hearing was postponed to December 10, 2013 at which the Plaintiff (who appeared with counsel) and a vocational expert, Jammie Massey, testified. [AR 63-101]  Before taking testimony, the ALJ asked to confirm first that the disability onset date was amended from October 31, 2009 to December 14, 2011 and, second, that the amendment mooted Plaintiff's claim for DIB benefits under Title II. [AR 66-68]  Plaintiff's counsel confirmed both

points and the hearing proceeded on Plaintiff's claim for SSI under Title XVI.

Plaintiff testified that she finished the 11th grade and never got her GED; she had been having difficulty with her back, neck, left shoulder, and sciatica; she could sit in a recliner for two hours at a time (30 minutes in an office chair), stand for 5-10 minutes at a time, and walk about 100 feet without stopping; she could dress herself with some difficulty (wore no clothes with buttons);she could lift nothing from the ground and a gallon of milk from a table; she was separated and living with a roommate who was on disability; she had no hobbies except television, she no longer walked for exercise, and drove a vehicle; she drank occasionally, smoked marijuana twice daily, and did cocaine once a year; she was seeing no mental health provider; her work history started in 1998 as a bartender and her longest job was as a roofer; she did her own laundry (one load every other week), shopped for groceries (15 minutes at the most), cleaned the house (vacuumed for five minutes once a week), cooked, and washed the dishes (5 to 7 minutes); the pain in her spine aches sometimes and stabs sometimes; surgery on her neck did not help with pain, so she was not sure about having surgery on her back; her hands went numb three times per day after using them; she had injections in her spine and tried narcotic medications for back pain, but it did not work; the only thing that worked for her pain was marijuana; she could not grasp items for very long without a "nerve jolt"; and, she got only 5-6 hours of sleep per night. [AR 68-91]

The ALJ then turned to the vocational expert, Ms. Massey, who testified that an individual with Plaintiff's age, experience and education and the following limitations –

> this individual could only lift or carry up to 10 pounds frequently and 20 pounds occasionally. This individual would require a sit-stand option while remaining at the work station, meaning that the individual could sit or stand at will while performing

assigned duties.

This individual could stand or walk with normal breaks for a total of six hours in an eight-hour work day. The individual could sit with normal breaks for a total of six hours in an eight-hour work day. This individual could perform pushing and pulling motions with upper and lower extremities but within the weight restrictions given.

This individual could perform postural activities only occasionally, and those would be climbing of ramps and stairs, stooping, crouching, and crawling, but the individual could not climb any ladders, ropes, or scaffolds. And the individual could perform overhead reach with the left upper extremity, but that would be limited to only occasional.

– could not perform the Plaintiff's past jobs but could perform the jobs of "routing clerk," "production assembler," and "office helper"; if the limitations were further restricted to "unable to consistently fulfill work for eight hours a day five days a week in order to complete a 40-hour work week and that this individual would miss more than four days in a work month on an unscheduled basis," the individual could perform no work.   [AR 92-96] Furthermore, if the individual were limited to using her hands repetitively for only five minutes at a time or to standing and walking around for 3-5 minutes during a sit/stand option, she would be unable to perform any of the jobs listed above and the limitations would eliminate all work.  [AR 96-100]

The ALJ issued an unfavorable decision on January 13, 2014. [AR 130-146] Plaintiff appealed the decision and the SSA Appeals Council remanded the case to the ALJ on September 9, 2014. [AR 147-149] The ALJ held a subsequent hearing on April 8, 2015 at which the Plaintiff and another vocational expert, Nora Dunne, testified. [AR 31-55] The ALJ first confirmed that Plaintiff had amended her disability onset date and dismissed her Title II claim, then noted that she needed to "change the wording of the sit-stand option" to comply with agency regulations.  [AR 34]

Accordingly, the ALJ repeated the hypothetical from the last hearing but added, "This individual would require a sit-stand option while remaining at the work station, meaning that the individual could sit or stand every 30 minutes for comfort while performing assigned duties." [AR 36-37] Ms. Dunne testified that such individual could not perform Plaintiff's past work, but could perform the jobs of production assembler, routing clerk, and office helper, as well as a "cashier II," "furniture rental consultant," and "investigator, car dealer accounts." [AR 38-39] However, if the same individual was limited to only occasional reaching, handling, and fingering, the individual could not perform the first four listed jobs, but could perform the last two [AR 43-45]; if the individual was further limited to needing "to walk around" during a sit/stand option, the individual could perform only the "investigator" position [AR 47-48]; if the individual needed to lie down at times during the day, such limitation would eliminate all work [AR 48].

Plaintiff testified that she had not had back or carpel tunnel surgery because the surgery on her neck "didn't help" and she "still ha[d] headaches" every day and "now I have inflammation in my shoulders, which makes it a lot worse"; her hands became numb if she used them longer than five minutes; her doctors would not give her pain medication so she just had to "deal with it"; she tried to stretch, walk, and lay down to relieve pain, but it did not help; she could stand for only ten minutes before her feet became numb; she could sit comfortably for 20 minutes; she needed to take breaks while cleaning house; and she took Aleve to help with headaches and inflammation.  [AR 49-54] The ALJ issued an unfavorable decision on May 29, 2015. [AR 13-24]

## **LEGAL STANDARDS**

To qualify for benefits under sections 216(i) and 223 of the SSA, an individual must meet

the insured status requirements of these sections, be under age 65, file an application for DIB and/or

SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(i), 423,

1382.  Additionally, SSI requires that an individual meet income, resource, and other relevant

requirements.  *See* 42 U.S.C. § 1382.

## I.    SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation

process used to determine whether an adult claimant is "disabled" under Title XVI of the Social

Security Act, which is generally defined as the "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than

12 months."  42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful

activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. § 416.920.  Step Two is a

determination of whether the claimant has a medically severe impairment or combination of

impairments as governed by 20 C.F.R. § 416.920(c).  If the claimant is unable to show that her

impairment(s) would have more than a minimal effect on her ability to do basic work activities, she

is not eligible for disability benefits.  *See* 20 C.F.R. 404.1520(c).  Step Three determines whether

the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to

preclude substantial gainful employment.  *See* 20 C.F.R. § 416.920(d).  If the impairment is not

listed, she is not presumed to be conclusively disabled.  Step Four then requires the claimant to show

that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from

performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. § 416.920(e) & (f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience.  *See* 20 C.F.R. § 416.920(g).

## II.     Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933

F.2d 799, 800 (10th Cir. 1991)).  However, reversal may be appropriate when the ALJ either applies

an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *Hamlin*,

365 F.3d at 1214 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

## ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the onset

date of her disability, December 14, 2011 (Step One).  [AR 19]  Further, the ALJ determined that

Plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar

spine; bilateral carpel tunnel syndrome; and left cubital tunnel syndrome (Step Two).  [*Id.*]  Next,

the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful

employment (Step Three).  [*Id.*]

The ALJ then determined that Plaintiff had the RFC to perform light work but with the

following limitations: the claimant can stand and/or walk, with normal breaks, for a total of six hours

in an eight hour workday; can sit, with normal breaks, up to six hours in an eight hour workday;

requires a sit/stand option while remaining at the workstation, meaning that claimant can sit/stand

every 30 minutes for comfort while performing their assigned duties; can lift and/or carry 10 pounds

frequently and 20 pounds occasionally; can perform pushing and pulling motions with her upper and

lower extremities within the aforementioned weight restrictions; can occasionally climb ramps/stairs,

stoop, crawling and crouch; cannot climb ladders, ropes and scaffolds, and can occasionally reach

overhead with the left upper extremity.  [AR 19-20]  The ALJ determined the record reflects

Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged

symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." [AR 20]

The ALJ found the Plaintiff was unable to perform any of her past relevant work (Step Four). [AR 22] The ALJ then proceeded to determine that, considering the Plaintiff's age, education, work experience, and residual functional capacity, there were jobs in the national economy that Plaintiff could perform, such as "cashier II," "furniture rental," and "investigator, car dealer." [AR 23] As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA.  [AR 24]

Plaintiff sought review of the ALJ's decision by the Appeals Council on July 13, 2015.  [AR 10-12]  On February 18, 2016, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 1-6]  Plaintiff timely filed her Complaint in this matter on April 12, 2016.

### ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) whether the ALJ properly considered all of Plaintiff's impairments, including those which she found to be non-severe, the opinions of medical and other sources, and Plaintiff's subjective complaints, in the residual functional capacity determination; (2) whether the ALJ considered the medical opinions of record and the opinions of other sources, who are medical providers, in accordance with applicable law; and (3) whether the ALJ's findings regarding Plaintiff's subjective complaints are supported by substantial evidence in

the record.

## ANALYSIS

The Court will address each of the Plaintiff's issues in turn.

## I. Whether the RFC is Supported by Substantial Evidence

Plaintiff claims first that the ALJ failed to consider Plaintiff's "headaches" in the RFC despite evidence that Plaintiff suffered ongoing, severe headaches even after the cervical fusion.[1]

Pursuant to 20 C.F.R. § 404.1520(a)(4)(ii), at the second step of the sequential evaluation process, an ALJ is required to determine whether a medically determinable impairment may be classified as severe and whether such impairment meets the duration requirement of 42 U.S.C. § 423(d)(1)(A), which provides:

(1) The term "disability" means--

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

"A physical or mental impairment must be established by medical evidence consisting of

---

[1] The Court is not convinced by Plaintiff's argument that the ALJ failed to adequately consider Plaintiff's carpal tunnel syndrome in the RFC, asserting the RFC "fails to address any manipulative limitations." Opening Brief at 24. The Plaintiff is incorrect that the ALJ's RFC prior to remand was "identical to the current RFC with respect to lifting, pushing, [and] pulling." *Id.* Rather, the prior RFC contained no restrictions regarding lifting, pushing, or pulling. [*See* AR 137] The ALJ specifically added such weight restrictions "in accordance with the findings of cervical pathology and moderate carpal tunnel syndrome and borderline cubital tunnel [syndrome]." [AR 22] Plaintiff fails to explain how such restrictions are insufficient and/or not supported by the evidence.

signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508.  Section 404.1508 provides that a claimant's "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  More specifically, "symptoms" are the claimant's description of his/her own physical or mental impairments; "signs" are anatomical, physiological, or psychological abnormalities that can be observed apart from symptom descriptions and must be shown by medically acceptable clinical diagnostic techniques; and "laboratory findings" are anatomical, physiological or psychological phenomena that can be shown by use of medically acceptable laboratory diagnostic techniques.  20 C.F.R. § 404.1528.

An ALJ's omission of an impairment altogether could be reversible error.  "It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less. ... Further, the failure to consider all of the impairments is reversible error."  *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006) (citations omitted); *see also Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

Here, the ALJ did not omit Plaintiff's headaches altogether from her Step 2 analysis; rather, the ALJ concluded:

> As for headaches, there are no treatment records to support any ongoing complaints and when she presented for orthopedic issues in early 2013 she denied any problems with headaches (Exh. 10F, p. 4). There is insufficient support within the evidence to

conclude that this complaint posed ongoing, vocationally relevant symptoms throughout any 12-month period, and it is not severe within the meaning of the Regulations.

[AR 19]  The Court agrees with Plaintiff that the evidence contradicts the ALJ's conclusion.  First, the record evidence reveals that on March 17, 2012, Plaintiff reported to Dr. Jackson that she was suffering from "headaches that started a few months ago" that had "a sudden onset and [could] last a few days."  [AR 372] Thereafter, although Plaintiff did not circle "headache" among the multiple symptom options she claimed to have been suffering on a form she presented to Dr. Silva on January 10, 2013 [AR 404 (referred by the ALJ as Exh. 10F, p. 4)], that same day she completed another form[2] for Dr. Silva seeking her "medical history" and, in particular, her "review of symptoms" on which she *did* mark "headaches" as a symptom.  [AR 419]  Moreover, on July 19, 2013, in preparation for Plaintiff's cervical fusion, NP Fleming noted in Plaintiff's "past medical history" that she suffered "chronic headaches related to C-spine disease."  [AR 496]  Following the cervical fusion in August 2013, Plaintiff presented to NP Fleming "with multiple complaints of pain" including "headaches" and "the left side of her head is throbbing."  [AR 550]  NP Fleming noted, "[S]he had a lot of these symptoms prior to her ne[ck] surgery[;] her headaches initially resolved after surgery however returned after about 1-1/2 months."  [*Id.*]  In addition, Plaintiff presented to Dr. Davis and Dr. Silva in February 2014 and several times in March 2014 complaining of "returning pain, headaches," "occipital headaches," and "sub-occipital headaches."  [AR 502, 506, 508, 510]  Finally, Plaintiff presented to NP Fleming on February 9, 2015 and reported, "She was taking a lot of aspirin for back pain, headaches, neck pain, shoulder pain. She stopped that because

---

[2]Notably, it appears that Plaintiff completed 16 pages of forms for Dr. Silva that day.

her stomach was bothering her. She is now taking Aleve. ... She wishes to discuss my prescribing pain medication for her."  [AR 560]

Second, Plaintiff testified on April 8, 2015 that she had not had back or carpel tunnel surgery because the surgery on her neck "didn't help" and she "still ha[d] headaches" every day and "now I have inflammation in my shoulders, which makes it a lot worse"; her doctors would not give her pain medication so she just had to "deal with it"; she tried to stretch, walk, and lay down to relieve the pain, but it did not help; and she took Aleve to help with headaches and inflammation.  [AR 49-54]

The Court cannot discern from the ALJ's conclusion whether she considered such evidence, particularly given the ALJ's incorrect factual findings that "there are no treatment records to support any ongoing complaints and when she presented for orthopedic issues in early 2013 she denied any problems with headaches."  Because the ALJ did not mention the above-listed record and testimonial evidence, the Court is left to assume she did not consider them.

Moreover, the Court finds that the ALJ failed to mention the Plaintiff's headaches in subsequent steps of her analysis, particularly in fashioning the RFC in this case (which was used to garner an opinion from the vocational expert as to Plaintiff's ability to perform the jobs of "cashier II," "furniture rental," and "investigator, car dealer.").  Again, the medical record reflects Dr. Davis's, Dr. Silva's, and NP Flemings' notations of Plaintiff's headaches and their treatment of them.  *See Williams*, 844 F.2d at 751 (a plaintiff need only show that an impairment would have more than a minimal effect on her ability to do basic work activities).  Without mention of the headaches at later steps in the decision, the Court cannot discern whether the ALJ considered them

singly and/or in combination with the other impairments to determine whether Plaintiff was disabled during the relevant time period. *See Walker v. Colvin*, No. 12-cv-235-EJF, 2014 WL 794261, at *7-*8, *12 (D. Utah. Feb. 27, 2014) (remanding matter for ALJ's failure to determine the plaintiff's migraines were medically determinable at step 2 and failure to consider them in subsequent steps).

Typically, "[a]n error at step two of the sequential evaluation concerning one impairment is usually harmless when the ALJ . . . finds another impairment is severe and proceeds to the remaining steps of the evaluation." *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)).  However, in this case, the RFC itself appears to include limitations only for the Plaintiff's spinal and shoulder pain [AR 22]; but, without any indication from the ALJ as to whether she considered Plaintiff's headaches, the Court cannot determine whether the RFC takes such impairment into account.  Therefore, the Court must conclude such omissions are reversible error under prevailing law. *See Wells*, 727 F.3d at 1069 ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

Because there is no indication the ALJ considered the Plaintiff's headaches at stages of her analysis subsequent to Step 2, particularly in formulating the RFC and determining whether the Plaintiff could perform the jobs of "cashier II," "furniture rental," and "investigator, car dealer" (including seeking testimony from the experts), the Court will reverse the ALJ's decision on this issue and remand to the Commissioner for further consideration. *See Sissom v. Colvin*, 512 F. App'x 762, 769 (10th Cir. 2013) (citing *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) and *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004)) (cautioning the ALJ on remand to "make

adequate findings" to assure that the correct legal standards are invoked and to ensure a meaningful appellate review).

## II.     Whether ALJ Failed to Weigh and to Give Adequate Deference to Physician Opinions

Plaintiff argues the ALJ failed to properly consider the opinions of the consultative examiner, Dr. Jackson, the consulting physician, Dr. Burkett, and her treating physicians. The Court finds the decision must be remanded for the ALJ's failure to apply the proper legal standards in analyzing the opinion evidence.

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin*, 365 F.3d at 1215 (citing 20 C.F.R. § 401.1527(d)). The ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight he assigns to them." *Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (internal quotation marks omitted). The applicable regulations governing the SSA's consideration of medical opinions distinguish among "treating" physicians, "examining" physicians, and "nonexamining" (or "consulting") physicians. *See* 20 C.F.R. § 416.927(c).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330. If the opinion is not supported by medically acceptable evidence, then the inquiry at this stage is complete.

20

*Watkins*, 350 F.3d at 1300.  However, if the ALJ "finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record ." *Id*.  If not, the opinion is not entitled to controlling weight.  *Id*.  In contrast, if the medical opinion of a treating physician is well supported by medically acceptable evidence and is not inconsistent with the other substantial evidence in the record, an ALJ must give it controlling weight.  *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)).

If the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician, the ALJ must move to step two and consider the following factors in determining how to evaluate other medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations.  *Id*. "An ALJ may dismiss or discount an opinion from a medical source only if his decision to do so is 'based on an evaluation of all of the factors set out in the cited regulations' and if he provides 'specific, legitimate reasons' for [the] rejection." *Id.* (quoting *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012)).

It is error for an ALJ not to adequately state and explain what weight he gives to  medical opinions.  *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).  The ALJ must give "good reasons" for the weight he ultimately assigns each medical opinion.  *Watkins*, 350 F.3d at 1301. The ALJ's decision must be sufficiently specific to make clear to any subsequent reviewer the weight given to the medical opinion, and the reason for that weight. *See Oldham v. Astrue*, 509 F.3d

1254, 1258 (10th Cir. 2007).  Even though an ALJ is not required to discuss every piece of evidence,

it must be clear that the ALJ considered all of the evidence.  *Clifton v. Chater*, 79 F.3d 1007, 1009-

10 (10th Cir. 1996). "[I]n addition to discussing the evidence supporting his decision, the ALJ also

must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly

probative evidence he rejects." *Id.* at 1010.  Boilerplate language, unconnected to any evidence in

the record, will not suffice to support an ALJ's conclusion.  *Hardman v. Barnhart*, 362 F.3d 676,

679 (10th Cir. 2004).   An ALJ may reasonably give less weight to a medical opinion that differs

from that same doctor's notes.  *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013).

First, the Court agrees with Defendant that the ALJ need not have considered "Med-9 forms"

as medical opinions.  It is appropriate for an ALJ to reject a physician's "Med-9" form, which is

prepared solely for a Colorado state disability benefits determination.  *See Chapo*, 682 F.3d at 1289

("The ALJ properly gave no weight to this conclusory [Med-9] form, which lacked any functional

findings.").

Second, the Court agrees with Plaintiff that the ALJ should have considered Dr. Davis's

opinions in July 2013, February 2014, and March 2014 that Plaintiff could pursue activities "as

tolerated."  *See Anderson v. Barnhart*, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) (a treating

physician's opinion that the "plaintiff would probably have intermittent and recurrent symptoms and

direct[ion] that plaintiff could be up as tolerated" constituted a "medical opinion" to which the ALJ

was required to assign weight); *Boland v. Astrue*, No. 2011 WL 5507377, at *12 (N.D. Ill. Nov. 10,

2011) (the ALJ's failure to address physician's opinion that claimant "could work and perform

activity as tolerated" required remand).  Thus, the Court finds the ALJ's conclusion that "a review

22

of the record in this case reveals no restrictions recommended by any treating physician" to be inaccurate and not supported by evidence in the record. [*See* AR 22] The decision must be remanded for the ALJ's failure to consider these treating physician opinions.

Third, the Court agrees with Plaintiff that the ALJ should have considered the opinion of the reviewing physician, Dr. Burkett.  Defendant argues the "merits" of Dr. Burkett's opinion by undertaking a Step 3 analysis and concludes, "Thus, Plaintiff cannot establish that she met all the criteria of Listing 1.04A." Resp. at 17.  However, the question is whether the ALJ considered the opinion at all in her decision and the Court finds she did not.  While it is possible the ALJ might have given the opinion little or no weight based on the same arguments made by Defendant, the fact that she did not consider the opinion at all requires remand of her decision.  *See Mays*, 739 F.3d at 578 (the ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight [s]he assigns to them.").

Finally, the Court agrees with Plaintiff that the ALJ's consideration of Dr. Jackson's opinion is insufficient under the law.  Dr. Jackson was retained by the SSA to conduct an examination of the Plaintiff in March 2012.  After a thorough physical examination, Dr. Jackson diagnosed Plaintiff with bilateral sciatica, left shoulder rotator cuff pain, cervicalgia, and tension headaches, and found Plaintiff could stand and walk for a total of 4 hours, and could sit for a total of 2 hours, in an 8-hour work day; could occasionally bend, stoop, squat, and twist, and could frequently lift and carry approximately 30 pounds; and could occasionally negotiate ladders and stairs.  [AR 376] Regarding this medical opinion, the ALJ found:

As for the opinion evidence, after conducting a physical examination of the claimant

23

in March 2012, Kimberly Jackson, DO, concluded the claimant should be able to stand or walk for four hours and sit for two hours, during an eight-hour workday. Lifting and carrying was limited to 30 pounds, due to shoulder pain, and Dr. Jackson advised occasional stooping and climbing of ladders and stairs, based on sciatica (Exh. 2F). While the undersigned generally agrees that the combination of the claimant's impairments would limit her to a range of light exertional tasks, [Dr. Jackson's] conclusions are clearly based upon the claimant's subjective statements rather than her clinical findings, which showed no radicular symptoms, excellent strength and maintenance of a normal gait (Id.). As such, her conclusions are accorded only partial weight.

[AR 21-22]

If the opinion to be evaluated is not by a treating physician, the ALJ must consider the following factors in determining how to evaluate such opinion: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Sedlak*, 2014 WL 717914, at *10. And, the ALJ must give "good reasons" for the weight he ultimately assigns each medical opinion. *Watkins*, 350 F.3d at 1301. Finally, an ALJ may dismiss or discount an opinion from a medical source only if her decision to do so is "based on an evaluation of all of the factors set out in the cited regulations" and if she provides "specific, legitimate reasons" for the rejection." *Chapo*, 682 F.3d at 1291.

Here, the ALJ accorded only partial weight to Dr. Jackson's opinion; however, her reason for such weight— "[Dr. Jackson's] conclusions are clearly based upon the claimant's subjective statements rather than her clinical findings, which showed no radicular symptoms, excellent strength and maintenance of a normal gait"—is not supported by the record. That is, while it appears Dr. Jackson's musculoskeletal examination revealed mostly normal findings, she also noted Plaintiff's

"pain" and "discomfort" during the cervical and shoulder examinations. [AR 374-375] Furthermore,

Dr. Jackson's clinical observations included:

> The patient was pleasant, cooperative, and in no acute distress. She appeared to sit somewhat uncomfortably during the exam, needed to support herself with her hands while seated, and had frequent pain-mitigating movements. She appeared somewhat uncomfortable getting on and off the examination table [and] removing her shoes, and [she] arose spontaneously and unaided from a seated position with moderate discernible discomfort.

[AR 373] The ALJ mentioned none of these findings, which contradict her conclusion that the doctor's findings were "clearly based only" on the Plaintiff's statements, in her analysis. In fact, the ALJ's use of the terms, "clearly based," "excellent strength," and "normal gait" reveals what appears to be the ALJ inserting her own opinion for that of the physician.

As such, the Court finds the ALJ's reason for discounting Dr. Jackson's opinion is neither "legitimate" nor "good" as is necessary to properly discount a treating physician's opinion. *Watkins*, 350 F.3d at 1301. Moreover, had the ALJ applied the proper legal standards in analyzing the weight to be afforded Dr. Jackson's opinion, she may have adjusted the RFC to account for such changes and proffered a different hypothetical to the VE during hearing testimony. *See Smith*, 172 F. App'x 795, 800 (10th Cir. 2006) ("hypothetical questions should be crafted carefully to reflect a claimant's RFC, because '[t]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner's] decision.") (citing *Hargis v. Sullivan*, 945 F.2d 1482, 1485 (10th Cir. 1991)). Accordingly, the decision must be remanded for further consideration of the weight to be afforded the examining physician's opinion concerning Plaintiff's physical abilities.

**III.    Remaining Issues**

The Court "address[es] only so much of Plaintiff's arguments as are sufficient to require reversal." *See Cross v. Colvin*, 25 F. Supp. 3d 1345, 1348 n.1 (D. Colo. 2014). The Court expresses no opinion as to the Plaintiff's remaining arguments, and neither party should take the Court's silence as implied approval or disapproval of the arguments. *See Watkins*, 350 F.3d at 1299 ("We will not reach the remaining issues raised by appellant because they may be affected by the [administrative law judge's] treatment of the case on remand."). The Court also does not suggest a result that should be reached on remand; rather, the Court encourages the parties, the ALJ, and the Commissioner on remand to consider fully and anew the evidence and all issues raised. *See Kepler v. Chater*, 68 F.3d 387, 391-92 (10th Cir. 1995) ("We do not dictate any result [by remanding the case]. Our remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case.") (citation and quotation marks omitted).

## CONCLUSION

In sum, the Court concludes that the ALJ failed to apply the correct legal standards in evaluating the opinion evidence and in analyzing and fashioning the RFC with respect to Plaintiff's headaches as described herein. Therefore, the decision of the ALJ that Plaintiff Kristen Bradley was not disabled since December 14, 2011 is REVERSED AND REMANDED to the Commissioner for further consideration in accordance with this order.

Dated at Denver, Colorado this 4th day of January, 2017.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge